number 1-18-2180 and 9-1-19-0358 consolidated Michael Underwood et al. versus City of Chicago et al. and we are here for oral argument today via Zoom for the record. With the lawyers who argue this case for both sides, please state your name for the record and then I will talk to you for just a minute about the procedure this afternoon. Good afternoon, Your Honors. Clint Krislov on behalf of the plaintiffs, the appellants, the participants, the retiree health care plans. Good afternoon, Your Honor. Carrie Donham on behalf of the Labor's and Retirement Board Employees Annuity and Benefit Fund of Chicago or generally known as the LABF. Good afternoon, Your Honor. I'm Sarah Hornstra on behalf of the Athlete City of Chicago. Good afternoon, Your Honor. Sarah Baikman and Edward Burke on behalf of the Municipal Employees Annuity and Benefit Fund of Chicago and the Fireman's Annuity and Benefit Fund of Chicago. Good afternoon. I'm Justin Kugler on behalf of the Policeman's Annuity and Benefit Fund of Chicago. Thank you, everyone. I would suggest once argument starts that everybody mute their microphones until it is your turn to address the court and I will try to remind you if you forget to turn it back on, but I think it'll help the person who's arguing. This is the way that we intend to proceed this afternoon. We will allow each lawyer to argue without interruption. Each side will have a total of 15 minutes. I realize there are multiple appellees, but there are really only two issues, I think, so you may, and I'll give you a minute to do so if you need to, perhaps via chat button. Talk amongst yourselves as to how you want to divide the time, but I think 15 minutes should be enough to address those issues. Mr. Kusloff, if you want to retain some of that time for rebuttal, you can do so. My expectation is that we will ask questions after each argument and those questions will not go against anybody's time and probably won't have questions in response to your rebuttal unless something comes up unexpectedly, but you can certainly reserve some of your 15 minutes for rebuttal. Once each person is through arguing, we'll ask questions, Justice Connors, then Justice Cunningham, and then myself. Are there any questions from any of the lawyers about how we intend to proceed? Not a question, Your Honor. This is Mr. Donham. The appellees did discuss the fact that we have 15 minutes and how to break it down, and our intention is that Ms. Hornstra, on behalf of the city, would take the first five minutes. I would take the second five minutes on behalf of the Laborers Fund, and then Sarah Baikman would take the last five minutes on behalf of the Firefighters and the Municipal Funds, and then Mr. Kugler would be available for questions if there are any concerning the Police Fund. Is there a sense, Mr. Donham, of each of you addressing a distinct issue or a different issue? I'm just trying to figure out when we should come in with questions. My guess is maybe we should come in with questions after the city and then come in again once all the funds are done arguing. Does that make sense in terms of how you see the argument? Yeah, I think that makes sense, Your Honor. The city is going to focus on a single issue. On the execution date? On the execution date, the funds have the other issue, and to the extent that there's something to add on the execution date, it'll be very limited. Then that's what we'll do. All right. I'm going to mute my microphone, and again, I invite everybody to do so, and then we will turn over to Mr. Crispo. Thank you, Your Honor. If I could reserve, I think, about four minutes for a reply, or maybe just be on the safe side, four and a half. May I begin? Your Honor, one of the important things to remember is that this is the last group of employees who, by their hire date preceding April 1, 1986, none of their city work qualified them for coverage under the federal Medicare program. That's why they were assured that they would have lifetime protection under the city plan, both by the statutes, by the funds positions, and by the pre-retirement seminars, which we have the testimony from. That's an important aspect that none of the courts and nobody on the other side has addressed. The fact is, these people have nowhere to go other than this plan. The four statutes explicitly require more than merely an abstract right to health care. The police and fire statutes say, the board shall contract with one or more carriers to provide group health insurance for all annuitants. That would include both Medicare and non-Medicare. Such group health insurance shall provide for protection against the financial costs of health care expenses incurred in or out of hospital, including basic hospital medical coverages. For the municipal and laborers, their statutes say that each employee annuitant in receipt of an annuity may participate in a group hospital care plan. This is not abstract. This is not just some general. The city and the funds both assured them all that they could rely on this coverage. The police fund handbook, which is attached to our complaint, says that the premium will be paid by the fund. The city sponsored retirement seminars told them that they would have this coverage to rely on in their retirement. This is different from Matthews, where everybody sort of understood that the benefit would be there. Here, we have the testimony attached to our complaint, the testimony of Mr. Cordick and Captain McDonough, who were the people who spoke. They were the city's authorized representatives. Indeed, they were authorized to represent the city to tell the retirees they would have this benefit. Indeed, during the preceding Corsak litigation, which this litigation is the continuation of, the funds not only readily acknowledged their obligation to provide coverage, they asserted it as the basis of their claims with us against the bound by judicial estoppel, admission against interest. This is one case in which the mend the whole doctrine, which says that in a contract case, you cannot take one position in the beginning of the case and then change your position to mend the whole, to fix your position when you decide to change your position and maybe become an allied with the city against the retirees. And the funds, the ruling that Judge Cohen issued before Judge Simon's opinion was not appealed by the funds, was not challenged by the funds. And the fact is, the funds are bound by his rulings repeatedly that they are required, they are obligated to provide a plan, a coverage for their annuitants. Justice Simon's opinion, which was dealing only with the appeal of the city, not the funds, affirmed the court's holding in all respects, except only adding that the dates of inclusion had been too restricted. And so Justice Simon held that all participants all participants who became participants on or before the execution date of the settlement agreement, sorry, all the people who were participants during the effect of those statutes are entitled to the protection. Now, when we get into the second aspect of the case, which is this appeal, which is who is in the protected class, this once again, Judge Cohen ruled in the ruling that we're dealing with here, Judge Cohen ruled in the most restrictive fashion. Koneva makes it clear that all issues are to be interpreted liberally in favor of the instead, Judge Cohen in deciding the what is the execution date, he picked the earliest possible date, the signing date, which is a date that would never be the effective date. And indeed, if you look at Justice Simon's opinion, where he variously picks, says everybody hired by the that's a paragraph 316164, everybody by the effective date, that's it is paragraph 48. Everyone who is hired by the operative date, that's paragraph 62. That'll mean the same thing, they are all referenced to the same date. And that all three are the same date means it can't be the signing, but it couldn't be the signing anyway, because the signing of a class action settlement is only effective upon its approval by the court. And indeed, Justice Cohen, Judge Cohen even took a more restrictive fashion rather than just pick the earliest possible day to exclude the greatest number of people. He then agreed to certify the question to this court of who was in the class, but refused to certify the question, his decision that the Korshak and Windows retirees before August 23, 1987 would not be certified to this court. But the issue from Justice Simon's opinion, where he says that everyone that the protected class is everyone who became a participant by the execution effective or operative date is entitled to the subsidy is entitled to this. That's what the city has to finance. Everyone is in the protected class who becomes a participant by June 30, the approval date, more likely become is in there by then or becomes an annuitant by June 30, 2013. That's the terms of the agreement. We address as well the issue of obviously the date has to requires reversal and remand as does the fact of the pension funds obligation to provide coverage. Those should all be his most recent ruling should be reversed and remanded back to the circuit court. And we do ask for reassignment to a new judge because each time he has had the opportunity to rule on something, he has taken the most restrictive pro city and funds position. And indeed, despite the fact that our complaint was upheld to proceed the first time it was before the appellate court. The reason that this case has taken seven years to still get to this interim point is we think attributable to the fact that every time the city or the funds decided that we should have to replete our complaint and rewind the case back to the beginning, he agreed to that and rewound the case back to the beginning. Our people are the most vulnerable demographic in the current COVID-19 terrible situation. They are all retirees. They are all over 65. Half of them don't qualify for Medicare because their city quarters didn't qualify them. They are entitled to the coverage that they were promised and that they need. And we need to have this sent to a new judge who can at least bring this to a close and that they can get what they're entitled to. I think I stayed close to within the right time. I apologize if I've gone over a bit. You were perfect on your timing. Justice Cunningham, do you have any questions? Please unmute yourself. No questions. Justice Connell. Mr. Kristof, can I ask you the basis for Judge Cohen's ruling? What's your impression of what his basis was? Was it based on the pension clause in the Constitution? Was it based on interpretation of the pension code? Or was it based on what I call Underwood II, or Judge Simon's opinion on Underwood II? I think it was based on, it clearly was his subsequent ruling for the pension funds, was based on, call it Underwood II, I suppose, his interpretation of Justice Simon's statements, which the appeal only concerned the city's appeal. And so once the Justice Simon came down saying the city's only obligation is to finance, the funds who had previously taken the position that this appeal did not concern their obligation because they hadn't appealed from Judge Cohen's finding, they then grabbed onto that to say, oh, this determines us too, that we're only obligated to provide the subsidy. Does that answer your question? Yes. Let me ask you this. These kind of benefits can be provided by statute and by contract. Is that right? Yes. Yes. Now, the statute reliant is the pension code, correct? Yes. And when you argue that the handbook and conversations between maybe city employees and representatives of the city with your clients, would that be part of the contract? How would you include that? The statute clearly says they shall provide, they shall contract to the carrier. The police fund handbook describes what the fund told to its annuitants. And it could be interpreted as either the contract that here's what we're saying, we will pay your premium, we'll provide their coverage. But that handbook came out because the way that the construct was, was that to get everybody in, and let me digress for one second, so you understand how we got into this. Because the city had previously provided the coverage for everybody. In order to get it off of the general corporate tax levy, they created this where the statute would say that the fund shall provide the coverage. And they did by contracting with the city, which agreed to be the insurer. And this was the whole Corsak, there's the fund, and the city agreed to provide to be the insurer to provide that coverage. And the funds would pay the premium, or though because the premiums were set at the subsidy amounts of the police and fire, and that would be paid by the city's special tax to fund the pension fund. But the bottom line is, it either is a, it is the terms of the contract, or it evidences what the pension funds viewed as the contract in those days. All right, let me ask you, Laborers Union in their brief talks about the status of the statute at the time that pertains to these persons. And they say the statute said that the fund must approve or ratify a plan. It doesn't say it needs to provide it. Do you think that's a distinction? It what what it says is, they have to find a plan. They don't need to be the they don't need to be the insurer or the sponsor. But the language of it, and I'm sure you'll remember from the Levin case, you know, where it says that the that the participants have the right to participate to the each employee annuitant and receive an annuity may participate. The concept here is, is really the same thing, that one way or another, the fund has to go get somebody to provide the coverage, the fund doesn't have to be the, the insurer, but it has to go find somebody to cover all their annuitants. And I understand doesn't say it has to subsidize it as well. The where what it says is, the board is authorized to make payments up to $25 per month. So if the subsidy is paid through the fund, which the fund gets reimbursed by the city for the subsidy. So in a sense, I guess the fund goes and gets the coverage. The language is it may or shall? The board shall pay to the organization underwriting such plan, the current monthly premiums up to the maximum amounts. Mr. Dunham's argument that it may or shall, may theirs, it'd be the entitlement is to any participant, each employee annuitant may participate in a group hospital care plan and group medical plan approved by the board. If the employee is age 65 and 15 years old, sort of in that context, the difference between the municipal and laborers on the one hand and the police and fire on the other is that because municipal and laborers employees work mostly their whole careers until age 65 before retiring without having the side opportunities to get into medical. Thank you. Thank you. I'm finished. Thank you, Justice Connors. That whole discussion, Mr. Kristoff, that you just had with Justice Connors about what exactly the obligations were of the various plans. That's something that was never decided below, correct? Because Judge Cohn just said this was already decided in Underwood too. On this round, he said that, I guess, can I, let me understand. My question is that the appeal that's before us now, in the appeal that's before us now, Judge Cohn didn't reach the merits of this argument. He said it was already decided in Underwood too. There's nothing for me to decide. He thought, and I think he misinterpreted Underwood too, as dealing with the funds obligation. I understand. So he never dealt with the funds obligation. He dealt with the funds obligation previous to Underwood. I understand that. I'm confused. The appeal that's before us now, it hasn't been decided by Judge Cohn. Right. Okay. So if we agree with you that it wasn't decided by Underwood too, right? Is there any reason we shouldn't send it back to the trial court to look at this issue in the first instance? No problem with that. Second question is, just so I'm clear, what's before us, there was also a dismissal of counts two through seven of your fourth amended, I think it was, complaint. That's not an issue before us right now, correct? Correct. So you would agree that we should affirm that part of the court's decision? No, no. Because what happened was the reason we're up here on what we're up here on is that Judge Cohn agreed to certify two questions. It's not, no. It's a 304A. It's not a certified question, and that's a different issue. That's a different appeal. It's a 304A appeal. So the 304A that is before us is of the entire dismissal order, and that includes dismissing counts two through seven. It is not a certified question. Mr. Connors is nodding, and this is what we do all day, Mr. Krisloff, so I think we're right on this. If I could, let me deal with this at our end while we're listening to our colleagues on the other side, and I can give you a definitive answer from our side of that. Okay, that's fine. That's fine. And my last question is, can you just briefly address the argument that the funds made, which is that in your PLA, you did read Underwood II with the same broad brush that Judge Cohn read it, saying, oh, yeah, it decided that the funds had no obligation. Can you address that briefly? I'd have to look at our PLA. I would not concede that if Underwood II dealt with those things, even the funds said that there was no jurisdiction to deal with that issue because they hadn't appealed that finding. It was an interim. It was another 304A, and what was before us was a dismissal. So I think that Underwood II made pretty clear why it was reaching the questions it was reaching. Anyway, let me do ask my one last question, and I promise this is the last question. Is there anywhere in your papers that you asked for a different judge on remand, or is this something that we're hearing for the first time in oral argument? Oh, no, no. This was where this happened was when we were on one of the other appeals, I believe on the interim petition on class certification because he put off class certification, said he was going to do it, and then didn't do it so that he's making decisions without giving notice to the people who were affected. On that one, we said finally that on remand, the court should reassign it. Mr. Donham then brought that up in oral argument during one of the hearings before Judge Cohen, and Judge Cohen has stayed all the proceedings. He said, well, because of that, he's refusing to rule on anything that we put up unless and until this rules, and he hears back from them because it's a waste of his time. I mean, we think- Okay. Just so I'm clear, on this appeal, you have not made that request. I think we have. We have in our reply brief, along with this reversal on remand, the court should issue directions to have the case reassigned to another chance re-judge to bring the matter to a cap with an appropriate resolution. Oh, it's in your reply brief. Okay. It's in our reply, yes. Thank you. All right. Are we going from here to the city? Is that correct? That's our intention, Your Honor. We will go and then- This is new compared to our old city. They're all city doors. Crazy. Somebody's microphone is not mute, and I can hear them mumbling in a way that I think whoever they are would prefer I not be able to hear them, so my suggestion is to everybody except for the council for the city that everybody else mute their microphone. Thank you. Justice McFarland, I was about to ask you to make that announcement, but I've heard several comments that I'm sure the commenters would prefer I did not hear. Justice McFarland may ask to call people by name because I still hear things. I'm still hearing whoever Allen is or Pagalis, they're still not muted, so this is a concern. Allen, please mute. Thank you. Thank you. All right, Ms. Hornstra. We'll hope for no audio mishaps from this end out. I will be brief with prepared remarks. May it please the court, although this appeal is coming before this court after years of litigation on the underlying subject of health benefits for retired city employees and after multiple rounds of appeals on various issues. The questions before this court today are quite narrow. This case was preceded by the Corsak litigation that began in 1987, which resulted in the 1988 settlement, followed by a series of successive settlements, the last of which was reached in 2003 with terms that expired in 2013. As that settlement was legal theories that all city retirees were entitled to continue receiving the highest level of the health benefits ever provided by the city. The circuit court dismissed the bulk of plaintiff's claims, and this court affirmed that dismissal in its 2017 decision. Under the holdings in the 2017 decision, or Underwood 2, I think as Justice Connors or Justice Cunningham referred to it, the holding of that case was that some retired city employees have a right under the pension clause to continue benefits, but only to benefits under the 1983 and 1985 amendments to the pension code providing for monthly subsidies. In this court's 2017 opinion, the court held the benefits provided under the 1983 and 1985 amendments are available to all individuals who join the city's system before the final settlement was executed in 2003. The narrow issue in one of the two consolidated appeals is what specific date in 2003 was intended by this court's prior holding, which I'll address today to the extent the court has questions on the other appeal concerning the funds obligations to provide health plans. I'll leave that issue to my counsel. This court's clear holding in its 2017 opinion was that it was the 2003 settlement that terminated new participants' rights to continuing benefits under the 1983 and 1985 amendments. As this court put it, it was when the 2003 settlement was executed that the parties agreed that the city would have the unilateral authority to end the program entirely, and the date the settlement was executed was April 4, 2003, when the party signed the agreement as the circuit court recognized. This court's reasoning there had to do with the fact that that was the point at which the parties came to an agreement. The court in 2017 explicitly stated that entitlement to the subsidies under the 1983 and 1985 amendments ceased for new entrants once the parties agreed that the city would have the authority to end the program. The court was also clear that that agreement put any new entrants to the retirement system on notice, that if and when the time-limited 2003 plan was terminated, the city could elect to provide no coverage. In holding that the relevant cutoff date was April 4, 2003, the circuit court in this case was simply adhering to the language of this court's decision in Underwood 2. It was not a matter of interpreting benefits, construing benefits narrowly in contravention of KINURBA. It was simply following what this court had said, which reasonably focused on the party's agreement and the notice. And in terms of, as we explain in our brief, it's common, you know, legal dictionaries generally will say that an executed contract means when the contract is signed, and the 2003 settlement agreement itself makes clear that execution referred to the signing of the agreement rather than judicial approval. The agreement states that, quote, subsequent to the execution, unquote, of this agreement, the parties will submit the agreement and proposed notice to the court and request judicial approval. And so the execution date is not the judicial approval date. The argument is that this is the 2003 settlement agreement, which is found in the appendix to the plaintiff's brief at, and it's at A46, and A47 under 3 makes that statement. And additionally, the reason the circuit court was correct in determining that the April 4 execution date was correct is that there's not a clear alternative date to that. In fact, the plaintiff's counsel at various stages of litigation have urged that the relevant date, they've been remarkably inconsistent in that. Plaintiff's opening brief in this case said that the effective or operative date should be June 30, 2003. In the reply brief, they said that the date was July 31, 2003. The actual beginning of the settlement period was July 1. Other times, they refer to final judicial approval. It's just really been all over the place. So it's certainly a simple place to look, to look to the execution date. But, you know, really we're talking about a difference of a few months if we're talking about when the settlement was signed versus when it went into effect or when it was judicially approved. What plaintiff's counsel is really trying to push here is an entirely different theory that a much broader group of people are entitled to benefits under the 1983 and 1985 amendments, including those hired up until the expiration of the settlement agreement in 2013, which is clearly contradicted by this court's opinion in the 2017 opinion, which made clear that the relevant cutoff was the 2003 settlement. During the terms of the 2003 settlement, it was clear to anyone who joined while that settlement was in effect that there was a time limit on those benefits and that at the expiration of the settlement, the city did not have an ongoing obligation. By the 304A finding that the circuit court in this case feels really on the, you know, who's entitled to the benefit, you know, which date in 2003 it should be. And as for the effort to... I'm going to stop you before you eat up the time of your co-appellee. I'm happy to entertain questions. Certainly. Justice Cunningham, do you have any questions for the city? No questions. Justice Conner. How quickly, and your opponent states that because this is a class action, we should be bound by a Knaisley or Knaisley case, which says that in a class action has to be approved by the trial court before an effective date could be authorized. Do you disagree with that? Well, the... I mean, what are the class action statute as well? That there has to be recognized as a fair and a reasonable settlement, and that can't be done until the court makes that finding. I mean, the Supreme Court's opinion in 2017 referred to the execution date. You know, it wasn't really an issue there. I think Judge Cohen's order was faithful to that. But, you know, this court could also decide that the judicial approval was during the event. There were multiple stages of judicial approval here. So the... I think it was June 4th there was, I think, the initial judicial approval. And then there were various dates. So, you know, it's a bit tricky to pick amongst those. You know, we think Judge Cohen was faithful to this court's decision in 2017. But the court may decide that some slightly later date should be the case. We'll just pick... Are you done, Justice Connors? The agreement also states, the 2003 agreement states that the agreement won't be effective until the Illinois legislature enacts legislation incorporating the terms of the pension code, correct? So isn't that a logical date? That's a pretty easy date to pin down. We do that all the time. It's also an option, you know, the 2017 decision really focused on the agreement and noticed. The idea was that out of fairness, anyone who joins the system, you know, should know what they're promised. And that is, you know, the legislation doesn't have to go into effect for that to be the case. Right. But we're looking for the effective date. That's what Underwood 2 tells us to look for, right? Well, Underwood 2, you know, it actually repeatedly said when the decision was executed, you know, in all of its holdings, it did alternatively refer once to when it went into effect and when it became operative. The overriding holding clearly was that, you know, it wasn't... It was when the 2003 settlement was executed that the parties made this agreement that new entrants to the system were put on notice. And the explicit holding was that the pension protection subsidy or pension protection clause locked in benefits for any retiree who began participating before the 2003 settlement was executed. And there's, you know, Judge Cohen was faithful to that. It's, you know, the law of the case in this case. And, you know, I'd add that if there were ever a case calling for application of the law of the case doctrine, you know, that sort of called the... That cautions against relitigating issues, that this is such a case that's been protracted and relitigated. And one example of that, in Mr. Crislaw's opening, there was a lot of discussion about retirement seminars and supposed promises. And those, you know, those allegations were the basis of claims for estoppel and contract claims that were dismissed and that were... The dismissal of that was affirmed in 2017. Those claims, those allegations are no longer at issue in this case, and they don't have a place in this appeal. Thank you, Council. Thank you. We would ask that the judgment of the circuit court be affirmed. The funds. Oh, Kerry Donham on behalf of the Laborers Fund, the LABF, the council, and may it please the court. I first want to address something that Mr. Crislaw said. He said that they're basically said that this was an appeal by the city or Underwood II was an appeal by the city in the appellants. Actually, it was just an appeal by the appellants. And let me read, and he implied that the funds had no standing in that appeal. Let me read from Underwood II, paragraph 12. This case is now before the court on an interlocutory appeal principally concerning the proprietary of the trial court's ruling on motions to dismiss filed by the city and the funds. So the funds position was certainly at issue in Underwood II, and that's important because this case, this appeal in terms of the provider plan is barred by law the case. And let me explain why. In Underwood II, paragraph 40, this court said that the pension protection clause protects the fixed subsidies. It does not protect an abstract right to health care coverage. And that's exactly what the idea that the funds should, quote, provide some unspecified, undefined plan is about. It's a distinction without a difference. It's exactly the same issue that this court decided in Underwood II. And in fact, your question was whether the plaintiffs pursued that to the Supreme Court. I don't want to steal from Ms. Bakeman, but let me read a quote from page 10 of their brief where they were quoting from the plaintiff's PLA. But what the appellate court ignored from our complaint is that the 1983 and 1985 statutes did not merely provide a subsidy. The statute squarely required the four annuity and benefit funds to provide health insurance for all annuitants. Like I say, that's page 10 of the complaint. The plaintiffs made this argument all the way to the Supreme Court, and the Supreme Court, as well as this court, rejected it. Therefore, there was an issue that was pursued to a final judgment, and it was decided against the current appellants. That's what law of the the circuit court to determine the merits. This court already determined the merits, along with the Supreme Court in denying the PLA. Now, if you do turn to the merits, there is no language in the section 160.1 of the 1985 amendment that says provide a plan. It says approve a plan. Now, let's look at what was going on historically. Before 1985, the city had been providing a health care plan. After 1985, all the way through the expiration of the 2003 settlement agreement, the city provided the plan. In the 2003 settlement agreement, it called for the city, not the funds, to provide a health care plan. There's been no change in the fund's position. They signed on to the 2003 settlement agreement, the same as Mr. Krisloff signed it, knowing that the funds were not providing a health care plan. It was the city, and the city's plan expired on June 30, 2013. So, there's no basis for these men-to-hold or estoppel arguments, and we address those in detail in our brief. The funds have never provided a health care plan. The funds, which are grossly underfunded, do not have the ability, financially, to provide a health care plan, whatever that means. To the extent that it means that they have to come up with a plan, well, annuitants currently have the ability to participate in one of two group plans and have the $25 subsidy credited toward their premium payments. So, if that's what Mr. Krisloff means, that's what the funds, certainly the laborers fund, is doing. And by the way, it also paid retroactive subsidies, going back from January 1, 2017, through December 31, 2019, to all eligible annuitants, in the manner that the circuit court approved, with notice and hearing, in which Mr. Krisloff continued. Let me say something about these counts two through seven that came up. Those were dismissed in Underwood too. There's no question about that. He kept repleting them when the case was remanded. The same counts that had been dismissed, Judge Cohen dismissed them again. He repleted them again. There is zealous advocacy, but then there's a point where you just go too far and keep repleting counts that have been dismissed repeatedly. It goes beyond zealous advocacy. The only other point that I would have is, I do think that the part that Sarah Hornster read about on pages 46, A46 and A47 of the settlement agreement, where it makes a distinction between the execution date, which it says after the execution date, the settlement agreement will be provided to the circuit court for approval. My presumption is that the Underwood 2 court was aware of that. It certainly had the settlement agreement before it in the record. Therefore, when it said execution date, that was deliberate and not some inadvertent reference. That's the end of my prepared remarks. Thank you, counsel. Ms. Bachman? Thank you. May it please the court, counsel, as I indicated, my name is Sarah Bachman. I'm joined with my colleague, Edward Burke. It gives me the privilege of representing the municipal fund and also the fireman's fund. As Mr. Don McDonough indicated at the start, I will limit my remarks to the healthcare issue, the provision of a healthcare plan, as counsel for the city already addressed the execution date issue. As Mr. Don McDonough pointed out, it is undisputed that this court held in its June 29, 2017 opinion that eligible fund annuitants retain the benefit under the pension protection clause to the fixed rate subsidies of the 1983 and 1985 amendments. After the case was remanded to the circuit court to find a workable solution to address how the under the direction of that court to implement a process to ensure that eligible annuitants received the statutory subsidies for 2017, 2018, 2019, and on a go-forward basis. Part of that payment process involved the funds working with insurance carriers to facilitate the payment of premiums on behalf of annuitants through the annuitants monthly annuity checks. Those payments also include the statutory subsidies that annuitants are eligible to receive consistent with this court's mandate. To reiterate, there are currently group healthcare plans available to fund retirees, both Medicare and non-Medicare eligible retirees, and retirees are receiving the 1983 and 1985 monthly subsidies. It is our position that this process fulfills this process does not fulfill the fund's legal obligation under the 1983 and 1985 amendments. Opposing counsel insists that the funds must also provide a healthcare plan for annuitants. He noted today that that includes finding a healthcare plan. Nowhere in the 1983 or the 1985 amendments is there any verbiage that describes finding a healthcare plan. His argument fails for three reasons. One, it is contrary to this court's June 29, 2017 mandate. Two, the funds are following the exact process today that was previously followed with respect to the processing of premiums and the payment of the monthly subsidy. And three, the Illinois Supreme Court has confirmed that the protected benefit is the tangible fixed-rate subsidies and not in-kind benefits such as the provision of healthcare. With respect to my first argument, this court is well aware of its 2017 opinion, and I think Mr. Donham addressed it, and I know Justice Miksa referred to our argument with respect to opposing counsel's reference to his argument in his PLA, which was denied. As I previously noted, the funds have implemented the court's mandate in facilitating the necessary process to ensure that participants are paid the required monthly subsidy. With respect to my second argument, I note that opposing counsel repeatedly refers to the prior healthcare plan provided by the city. Opposing counsel alleges that the funds previously fulfilled the obligation under the 1983 and 1985 amendments by contracting with the city to provide that healthcare plan. However, there's no evidence that there was a contract or other document that evidences some type of contract between the city and the funds. Instead, the funds simply facilitated the processing of premiums and payment of subsidies to a healthcare insurer. As I noted, this is the exact process the funds are following today. For my last argument, I note that the Illinois Supreme Court emphasized in KONERVA that the Pension Protection Clause protects a particular amount of money and not a particular quantum of buying power. Opposing counsel is asking this court to provide annuitants with a particular quantum of buying power, i.e., a particular level of medical care, the city's prior plan. I also note that opposing counsel cited the Levin decision in a motion filed with this court yesterday afternoon. In its per curiam opinion, the Supreme Court was clear that the decision could not be cited as precedent. Even if it was to be used as precedent, the facts of Levin stand stark contrast to this case. In Levin, the Cook County Pension Fund is currently providing a healthcare plan under a current statute found in the Illinois Pension Code. In that case, this court did not comment on whether the Cook County Pension Fund is legally obligated to provide that plan. Instead, this court held that because the Cook County Pension Fund is providing a plan, it cannot prevent Ms. Levin's participation in that plan based on an eligibility rule that was passed in the past. Importantly, this court declined to decide whether Ms. Levin's right to participate is a protected constitutional right. In sum, I respectfully request that this court uphold the Circuit Court's September 12, 2018 order, finding that the funds do not have an obligation to provide a healthcare plan and that the sole protected benefit is the payment of a monthly fixed-rate healthcare subsidy to eligible annuitants under the 1983 and 1985 amendments. Thank you for your time. Thank you, Counsel. Justice Cunningham, do you have any questions for Mr. Donahan or Ms. Beckman? No questions. Justice Connell? Yes. All this that you just mentioned, Ms. Beckman, was that before the trial court in making his ruling relative to these issues, as far as that you have plans available that you can administer or do a full-through ad? All that's in the record? It is. So, again, you can get these benefits by either the Constitution or by a statute. Now, your statute says that you must approve or ratify a plan, correct? Oh, no, that's the laborers, Jan. That's the laborers. What is the third part? So, I represent the Municipal Fund and the Fireman's Fund. The Fireman's Fund is under the... So, your question is still relevant to one of my clients. And what I would say to that is... I'm sorry, Justice Conners. I didn't mean to cut you off. No, please go ahead. I'm sorry. Thank you. What I would say to that is, as you know, the 1983 and 1985 amendments were replaced in their entirety by successor amendments to the Illinois Pension Code. And what this court held, and what we're deeming Underwood Part 2 or Underwood 2, what this court held was that even though those amendments have been replaced in their entirety in the Pension Code, the Constitution, the Pension Protection Clause, protects the subsidies that were provided in those plans. And so, the funds have an ongoing duty, the funds in the city, through the city's financing of the funds, have an ongoing duty to ensure that benefits... that participants have a right to that benefit, notwithstanding the fact that the General Assembly replaced and removed those statutes in their entirety. So, our position is that this court, in Underwood Part 2, confirmed that while those statutes might no longer be in the Illinois Pension Code, what is revived, or what remains, is annuitants' right to that subsidy via the Pension Protection Clause. And I think that's consistent with Conerva, which, as I noted, confirmed that the benefit that's protected is that tangible fixed-rate subsidy. Again, that applies to the state of Illinois, the state of Chicago, whatever the initial or whatever the governmental body is, not to the fund, correct? I apologize, I'm not sure I quite understand your question. I mean, the funds are obviously... Sorry, you go. No, go ahead, Justice O'Connor. No, no, no. Finish your sentence, I'm sorry. I was just going to say, I mean, the funds definitely are subject to the Pension Protection Clause insofar, as we mentioned, they facilitate the payment of this subsidy that's owed to their annuitants that is protected. The funding of that subsidy is through the city, and the Supreme Court has confirmed on numerous occasions that it's really irrespective of how much money the pension funds have or what assets they control, that the city of Chicago, or you noted with respect to state annuitants, the employer has the ongoing duty to ensure that those annuitants get the benefits that they were promised on the date they were hired. And there's no case law that says the fund must contribute to that as well? Correct. Thank you. Thank you, that's all. I guess I'll stay with you, Ms. Baikman and Mr. Dunn, sort of, if you want to chime in, you can too, sort of following up on what you just both said, which is that the funds are providing plans, they are facilitating the payment of the subsidies into those plans. But my reading of your briefs, on your reading of Underwood too, is that you have no obligation. If you decided tomorrow, we're not going to do anything to help these people, you would have no obligation because the current statute doesn't require you to do that. Is that your position or not, Ms. Baikman? I'm confused. Thank you, Justice Nixon. I would clarify, and I apologize if my comments were confusing. The funds are not currently providing a health care plan. They have worked with insurance carriers to ensure that those retirees that are participating in those group plans continue to receive the benefit that's protected under the pension code. I understand. So, at this point, you're facilitating rather than providing, but is it your position that you have an obligation to do that under the pension clause for participants that participated at a point that you had that obligation? It's an ongoing obligation, no matter what the statute, how the statute is changed, for people that participated at a point that they had that right to that facilitation. Do you understand my question? I do. I do. I apologize. I'm trying to be very sensitive to not talking over anyone. So, I do understand your question. Thank you for that. And what I would say to that question is that we, as Conerva and the Supreme Court and this court has held on numerous occasions, annuitants get the benefit, the protected benefit that annuitants are entitled to is what benefit was provided by statute on the date of their hire. And what I would say is that, and I hope I emphasize this, that the funds are doing exactly what they did previously, and they will continue to do so, which is ensure that annuitants receive the monthly subsidy that they are entitled to under the pension protection clause. So, the facilitation, I think you used the word that we're facilitating that payment, the funds would continue to do that because, again, that payment of the subsidy is, this court has said, and we agree, it's the law that they're entitled to that monthly fixed rate subsidy. That's a protected benefit. And it includes some obligations on the part of the funds to facilitate. Constitutionally, you agree with that? Yes, Your Honor. And I would also say that, and I think I answered this when Justice O'Connor said her question, is that the city also has an obligation to fund that benefit. And we understand that. Okay. Mr. Donald, did you want to say anything differently, or do you agree that you have a constitutional obligation to continue to facilitate or do whatever was in place in 1983 and 1985 for those participants? Yes. We have a constitutional obligation to continue to subsidize retirees' healthcare. We can't do what was in place in 1985 because in 1985, the city was providing the healthcare plan. And the way the statute is written, it's written very awkwardly. It says, pay to the underwriter. And in fact, what was done, it was paid kind of in a large sum. It wasn't paid individually. So I agree that the fund intends to facilitate. If there's a group plan, it will find a group plan. And it's very awkward because what we have to realize is that the trustees, and this is important, the trustees are limited to what the General Assembly gives them, what authority it gives them. The authority that they have is to allow participants to participate in a plan for medical and surgical care that they approve and then pay to the underwriter of the plan $25 a month, no more than that. So I think it's very awkward. And I don't know that I can say that there's a constitutional right. Remember the pension protection clause protects what's in the statute. The contract is decided by the statute. It protects the benefits provided by contract. So what I can say though, is that the Laborers Fund intends to continue to do what it has been doing and what it is doing now, facilitating the payment of the subsidy. But I think it's a slightly different question then, is there a constitutional obligation to approve a plan? I think it's a very awkwardly worded statute at this point in time, given all the history that we've had over the last 40 years. Okay. That's a fair answer. Sorry, Mr. Crisloff, we've got a... There we go. I'm not sure where to start, but let me start with the statute. The statute says for police and fire, the board shall contract with one or more carriers to provide group health insurance to all annuitants. And it goes on to specify the terms of what's the minimum, and they can also provide supplements. So for police and fire, this isn't an awkward sort of thing that, I mean, with the funds, there aren't enough corners of the mouth to speak out of to get a consistent statement. With respect to the municipal and laborers, each employee annuitant in receipt of an annuity on the effective date may participate in a group hospital care plan and a group medical and surgical plan approved by the board. What it clearly contemplates is that the fund is going to do that. It's not awkward. It's not what Mr. Dunham sort of refers to. And so there is the obligation of the fund. Ask them who they've contracted with. And the answer is they haven't contracted with a carrier. Ask them about non-Medicare people. So some of the plans have advantage programs for Medicare people, but you can't get an if you're not in Medicare. And our people, in order to be in Medicare, have to pay not only the premium for A, but also B, and they both come with substantial penalties, which are essentially for life. Now, one other that I promised to get back to you on was the basis of what we're here on. And that, if you look to appendix page 20, let's see. What we're here on, oh, here it is. The order of September 28, 2013, what we've been, none of these are, wait a second, I got to get you back in my Zoom. Sorry, there we are. Plaintiff's motions regarding the September 12, 2018 order. Sorry, it's plaintiff's motion to modify the September 12, 2018 order is denied. Plaintiff's oral request to certify the question for appeal is denied. Plaintiff's motion for the court to enter rule 304A language addressing the court's September 12, 2018 memorandum and order, specifically limited to the court's finding that the police, fire, municipal, and laborers, city of Chicago pension funds have no obligation to provide healthcare plans for their annuitants under the 1983 amendments to the fire and police pension fund articles and the 1985 amendments to laborers and municipal fund articles is granted. And this court finds there's no just reason for delaying appeal limited solely to that holding. And then they deal with the, and he then dealt after that with respect to the date of application. So we are not here on final judgment appeals. There has been no final judgment entered in the case. In fact, Judge Cohen refused to enter a And so what we are here on is purely his ruling that the, um, the funds now don't have an obligation to provide coverage other than the subsidy and the people who are included. That brings up the other issue, which is dealing with the estoppel. We had asked him because the timing of this came up the Matthews case, which basically said that you need to, if you're going to support estoppel, you need to have somebody with authority speak that speaks for the city. And so we, while we have had at all times, the McDonough and the Kodak testimony of who authorized them to speak to the retirees, we sought to amend the complaint just to say that to add in their explicit authority. Judge Cohen denied that, denied us leave to And that's still, that'll be for some future time. With respect to the subsidies, the only reason they're paying any of these subsidies now is because we move to force them to do that. That's the one thing that we agreed with Justice Simon on, which was that they have to make the subsidy. They have to pay the subsidies. And both the city and the funds, they both said, Oh no, not me. Oh no, not me. Oh no, we're not obligated to do it. And so they are only doing it because we moved to force them to do it. Let's see. The 1983 and 85 statutes, those were only replaced after they were, they were they were, they weren't eliminated. They were just for the interim periods to 2013 supplanted by the interim statutes and settlements. Now, with respect to this business of who's in the settlement, it's really the one thing they focus on execution date, but they ignore the Justice Simon use for the same date. The term execution, effective or operative date. Now execution doesn't just mean signing. The reason that we usually refer to a contract as being executed is that it becomes effective and in effect when it's been thought, usually when it's been signed by everybody, no problem. But with a class settlement, the contract does not become executed in the sense that it becomes effective. And if you look at our brief, the attachments from all the legal dictionaries show that the term doesn't just mean signed. Mr. Kristof, I'm going to stop you. You made this point, as you said, in your brief and in your opening and your time is pretty much up. And I know I promised no more questions, but I do have a question that I really need you to address. Sure. Which is given the fact that the funds say that they are doing now exactly or close to what they were doing in 1983 and 1985, when those statutes were in effect, that they are facilitating use of the subsidies to buy health care and that there are plans available. What is it that you see them as having the obligation to do? Oh, thanks. Because- You've got to make this brief or my fellow panel members will unpreside me. So just address it really directly, please. They're facilitating you is what they're doing. The fact is the statutes require them to find a plan for their members. The police and fire have to contract with a carrier, merely facilitating. Now, a couple of unions have come up with advantage plans that they posit that their funds have said, okay, we'll process those. The funds have not found a plan for their people. And indeed for many of the people, the only plan that's around is the non-sponsored Blue Cross plan because they didn't find, the city went out and find it, but disavows any connection to, which costs like $3,000 a month individually. Okay. So their obligation is to find a plan, not to fund it, not to help pay the subsidies, just to find a plan in your view. Right. They have to contract with a carrier and get coverage. And that coverage would be paid in part by the subsidies. And to the extent it's not paid by the subsidies, it'd be paid by the participant. Right. Right. And those, even like the county plan in Leaven, if the fund looks for a plan, they can find a plan that will cover these people. I mean, the CORSHA can win those people who are- And Mr. Poplar, you've answered my question. Okay. Thank you. Does anybody else have any additional questions? No questions. All right. Thank you all. We've gone far over. I appreciate everybody's patience and participation. We will take this matter under advisement and you will hear from us shortly. Thank you all.